## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-20247-CIV-MARTINEZ/AOR

CARLOS PRIETO,

      Plaintiff,

v.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

      Defendant.

_____/

### REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Carlos Prieto's ("Claimant") Motion for Summary Judgment [D.E. 25], Statement of Material Facts [D.E. 26], and Memorandum in Support of His Motion for Summary Judgment [D.E. 27] (together, "Claimant's Motion for Summary Judgment"), and Defendant Kilolo Kijakazi,  Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 28].  The administrative transcript (hereafter, "TR.") has been filed [D.E. 17].[2]   For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

## PROCEDURAL HISTORY

Claimant was found to be disabled as of September 30, 2011 and thereafter began receiving disability insurance benefits.  TR. 33.  Following a conditional reexamination, Claimant was found to no longer be disabled as of January 1, 2016.  Id.  Upon reconsideration after a disability hearing, a State agency Disability Hearing Officer upheld this determination.  Id.  On January 3, 2016, Claimant started working part-time at an Amazon fulfillment center.  Id. at 291.   On November 28, 2016, Claimant filed a timely written request for a hearing before an Administrative Law Judge ("ALJ").  Id. at 211-13.  On August 3, 2018, ALJ Norman Hemming ("ALJ Hemming") held a hearing, at which Claimant, Claimant's sister-in-law Janet Prieto ("Ms. Prieto"), and Vocational Expert Robin Jackson ("VE Jackson") testified.  Id. at 62-129.  On October 31, 2018, ALJ Hemming issued an Unfavorable Decision consisting of the following findings:

(1) The comparison point decision (hereinafter, "CPD"), namely, the most recent date that Claimant was favorably determined to be medically disabled, was March 30, 2012.  Id. at 35.

(2) At the CPD, Claimant's medical impairment was depression.  This impairment was found to meet section 12.04A of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d)).  Id.

(3) From the CPD to October 31, 2018, Claimant did not engage in substantial gainful activity (hereafter, "SGA") (20 C.F.R. § 404.1594(f)(1)).  Id.[3]

(4) The medical evidence confirmed that from January 1, 2016 to October 31, 2018, Claimant's medical impairments were obesity and affective disorder.  Id.

---

[3] A person who is earning more than a certain monthly amount is considered to be engaging in SGA.  See https://www.ssa.gov/oact/cola/sga.html.  The SGA amount was $1,130 per month (or $13,560 annually) in 2016 and $1,170 per month (or $14,040 annually) in 2017.  Id.  While working part-time at Amazon, Claimant earned $9,961.88 in 2016 and $9,030.28 in 2017.  TR. 296.

(5) As of January 1, 2016, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).  Id.[4]

(6) As of January 1, 2016, Claimant's medical condition had improved (20 C.F.R. § 404.1594(b)(1)).  Id. at 36.

(7) Claimant's medical improvement correlated with his ability to work because, as of January 1, 2016, Claimant's CPD impairment no longer met or medically equaled the same listing that was met at the time of the CPD (20 C.F.R. § 404.1594(c)(3)(i)).  Id.

(8) As of January 1, 2016, Claimant continued to have a severe impairment or combination of impairments (20 C.F.R. § 404.1594(f)(6)).  Id.

(9) As of January 1, 2016, Claimant had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), subject to additional limitations.  Id. at 37.[5]

(10) As of January 1, 2016, Claimant was capable of performing past relevant work as vendor, hospital house supervisor, stores laborer, and automobile salesperson.  This work did not require the performance of work-related activities precluded by the Claimant's RFC based on the impairments present since January 1, 2016.  Id. at 39-40.[6]

(11) As of January 1, 2016, Claimant's disability ended.  Id. at 40.

---

[4] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c).

[6] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §404.1560(b)(1) (2012).

On October 4, 2019, the Appeals Council denied Claimant's request for review of ALJ Hemming's decision. Id. at 5. On January 20, 2020, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Hemming's final administrative decision [D.E. 1].

In support of his contention that ALJ Hemming's Unfavorable Decision should be reversed, Claimant argues that:

I.    The ALJ's RFC assessment was incomplete because it:

    a.   Failed to account for Claimant's mental impairments; and

    b.   Failed to account for Claimant's medication side effects.

II.   The Appeals Council erroneously found that new evidence submitted to it was not likely to change the ALJ's decision.

See Claimant's Motion for Summary Judgment [D.E. 27 at 4-13]. The undersigned finds no merit in any of these contentions.

### RELEVANT MEDICAL EVIDENCE

**I. MENTAL HEALTH PROVIDERS**

  **A. Treating Sources**

    **1) Treating Psychiatrist – Roberto Hernando, M.D. ("Dr. Hernando"), at Mental Health Partners, Inc.**

On March 5, 2014, Claimant underwent a psychiatric evaluation by Dr. Hernando. TR. 572-575. Claimant's mental status assessment revealed that: his manner of dress and hygiene were appropriate; his mood was anxious; his behavior was calm; his affect was expressive; he showed no signs of perceptual disturbances; he was cooperative; his thought content was unremarkable; he was reliable and accurate; his speech was normal; his thought process was logical and goal-directed; he was oriented in all spheres; his judgment was intact and his insight was good; his attention was normal; and he denied suicidality or homicidality. Id. at 574. He was diagnosed

with bipolar disorder.  Id. at 575.  Dr. Hernando assigned Claimant a Global Assessment of Functioning ("GAF") score of 55.  Id. at 575.[7]

On June 5, 2014, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 576.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On August 5, 2014, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 577.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that

---

[7] "Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations."  Vargas v. Astrue, No. 07-CV-60776, 2008 WL 4056164, at *3 (S.D. Fla. Aug. 25, 2008).  A score between 51 and 60 indicates moderate symptoms or impairments.  Kent v. Acting Comm'r of the Soc. Sec. Admin., 651 F. App'x 964, 966 n.4 (11th Cir. 2016) (citing American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 2000)).

Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On October 1, 2014, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 578.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On December 1, 2014, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 579.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On January 28, 2015, Claimant was seen by Dr. Hernando for evaluation of depression. Id. at 580-583. Claimant denied having experienced weight change, fatigue, weakness, fever or chills, or any dizziness, numbness, tingling tremors, weakness, fainting, seizures, or memory loss. Id. at 580. Claimant had anxiety, but he stated that he felt stable and he presented no signs of agitation or distress. Id. Dr. Hernando discussed the possibility of re-initiating psychotherapy to try to achieve further improvement, and Claimant agreed to do so. Id. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was appropriate; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were good. Id. at 580-581. Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications. Id. at 581. He was diagnosed with bipolar disorder, most recent episode manic without psychotic features. Id. Dr. Hernando discussed the diagnosis and plan of care with Claimant, including diet, activity, exercise, medication side effects, and advised him to go to the emergency room in case of severe change in his condition or medical problems. Id. at 582

On March 23, 2015, Claimant followed up with Dr. Hernando for psychotherapy and medication review. Id. at 584. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect

was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself.  Id.

On May 19, 2015, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 585.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, memory, and abstraction were intact; his attention/concentration was impaired; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself.  Id.

On July 16, 2015, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 586.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself.  Id.

On September 14, 2015, Claimant followed up with Dr. Hernando for psychotherapy and medication review. Id. at 587. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair. Id. Dr. Hernando noted that Claimant was able to care for himself. Id.

On November 10, 2015, Claimant followed up with Dr. Hernando for psychotherapy and medication review. Id. at 588. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was depressed; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair. Id. Dr. Hernando noted that Claimant was able to care for himself. Id.

On January 6, 2016, Claimant followed up with Dr. Hernando for psychotherapy and medication review. Id. at 589. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he

displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On April 5, 2016, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 590.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On April 27, 2016, Dr. Hernando stated in a letter that Claimant had a history of psychiatric morbidity remarkable for bipolar disorder and was currently taking Abilify and Benztropine.  Id. at 570.

On June 29, 2016, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 591.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions,

suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On October 20, 2016, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 592.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On November 2, 2016, Dr. Hernando stated in a letter that Claimant: had a history of psychiatric morbidity remarkable for bipolar disorder; was currently taking Abilify and Benztropine; was undergoing outpatient treatment; and was stable and well-maintained on medication.  Id. at 565.

On January 10, 2017, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 593.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation and memory were intact; his attention/concentration was impaired; his abstraction was concrete; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed;

his thought content was unremarkable and he displayed no obsessions, compulsions, suicidality, or homicidality, but he displayed paranoid delusions; and his insight and judgment were fair.  Id. Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On May 4, 2017, Claimant followed up with Dr. Hernando for psychotherapy and medication review on.  Id. at 594.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On March 29, 2017, Claimant followed up with Dr. Hernando for psychotherapy and medication review.  Id. at 595.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was good; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight was good; his judgment was fair.  Id.  Dr. Hernando noted that Claimant was able to care for himself, and that he understood the risks and benefits of his current regime of medications.  Id.

On November 29, 2017, Claimant was seen by Rosa Poviones, ARNP ("ARNP Poviones") in conjunction with Dr. Hernando for psychotherapy and medication review.  Id. at 596. Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were fair.  Id.  Claimant was able to care for himself and he understood the risks and benefits of his current regime of medications.  Id.  An assessment of involuntary movement was completed and there was no evidence of involuntary movement.  Id.

On March 22, 2018, Claimant was seen by ARNP Poviones in conjunction with Dr. Hernando for psychotherapy and medication review.  Id. at 597.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight was good; his judgment was fair.  Id.  Claimant was able to care for himself and he understood the risks and benefits of his current regime of medications.  Id.  An assessment of involuntary movement was completed and there was no evidence of involuntary movement.  Id.

On July 9, 2018, Claimant was seen by ARNP Poviones in conjunction with Dr. Hernando for psychotherapy and medication review.  Id. at 598.  Claimant was responding well to treatment; he was not in acute distress, and he reported no side effects.  Id.  Claimant's mental status exam revealed that: his appearance was appropriate; his psychomotor activity was normal; his attitude was cooperative; his eye contact was fair; his speech was coherent; his orientation, attention/concentration, memory, and abstraction were intact; his ability to find similarities was good; his mood was anxious; his affect was expressive; he had no perceptual disturbances; his thought process was goal-directed; his thought content was unremarkable and he displayed no delusions, obsessions, compulsions, suicidality, or homicidality; and his insight and judgment were good.  Id.  Claimant was able to care for himself and he understood the risks and benefits of his current regime of medications.  Id.  An assessment of involuntary movement was completed and there was no evidence of involuntary movement.  Id.  Dr. Hernando stated in a letter that Claimant: had a history of psychiatric morbidity remarkable for bipolar disorder; was currently taking Abilify; and was undergoing outpatient treatment for his psychiatric condition.  Id. at 600.

### B.  Non-treating Sources

#### 1)  State Agency Psychological Consultant Julie Bruno, Psy.D. ("Dr. Bruno")

On January 15, 2016, Dr. Bruno completed a Psychiatric Review Technique ("PRT") and a Mental RFC for Claimant.  Id. at 144-148.  Dr. Bruno opined that Claimant had: mild restrictions of daily living; moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, and pace; and no difficulties with repeated episodes of decompensation, each of extended duration.  Id. at 144.  Dr. Bruno further opined that the medical evidence supported the conclusion that Claimant's medically determinable impairments were severe, but

there had been medical improvement in Claimant's impairments since the CPD, which was related to Claimant's ability to do work.  Id. at 145-46.

Dr. Bruno also opined that Claimant had no limitations with regards to understanding and memory.  Id. at 146.  Dr. Bruno further opined that Claimant had the following limitations with regards to concentration and persistence: Claimant was not significantly limited in his ability to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, and to make simple work-related decisions; Claimant was moderately limited in his ability to carry out detailed instructions, to work in coordination with others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 146-47.  Dr. Bruno further opined that Claimant's attention and concentration were intact; and that he had at a minimum an average IQ, was going to college, was socially appropriate with others, was stable on medications over the three years prior to the report, had no inpatient hospitalizations since the allowance of disability benefits, was fully functional as to activities of daily living, and was capable of simple, routine tasks.  Id. 147.

Dr. Bruno further opined that Claimant had the following social limitations: he was not significantly limited in his ability to ask simple questions or request assistance, to accept instruction and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and he was moderately limited in his ability to interact appropriately with the general public and to get along

with coworkers or peers without distracting them or exhibiting behavioral extremes.  Id.  Dr. Bruno opined that Claimant got along with peers and authority figures but got anxious in crowds.  Id.

Dr. Bruno further opined that Claimant had no adaptation limitations and that Claimant's activities of daily living were grossly intact.  Id.

### 2) State Agency Psychological Consultant Catharina Eeltink, Ph.D., M.P.H. ("Dr. Eeltink")

On June 8, 2016, Dr. Eeltink completed a PRT for Claimant.  Id. at 529-41.  Dr. Eeltink opined that Claimant had: mild restrictions of daily living; moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, and pace; and no difficulties with repeated episodes of decompensation, each of extended duration.  Id. at 539.  Dr. Eeltink further opined that Claimant did not like being around crowds and had reduced concentration and memory; however, his mental status exams were within normal limits, he was compliant with medications, and he had no marked difficulty completing routine tasks independently.  Id. at 541. Dr. Eeltink further opined that Claimant had moderate limitations in concentration and socialization due to mental impairments; but he was able to complete simple repetitive tasks independently on an ongoing basis in an environment with limited interpersonal contact.  Id.  Dr. Eeltink further opined that Claimant's symptomatic allegations and resulting mental impairments were fully consistent with the medical evidence of record and Claimant's mental health history. Id.

### REPORT OF CONTACT

In a report of contact dated January 13, 2016, Claimant stated that he lived at home with his parents.  Id. at 334.  He stated he had difficulty sleeping at night, but he took his medications and the medications worked all of the time.  Id.  He stated he had no problem making sandwiches and heating pizza in the oven, but his mother did most of the cooking because "it's always been

that way". Id. He had no problems doing basic math, and he washed dishes and had no problem helping out. Id. He drove without difficulty, but his mother did the grocery shopping and he generally stayed home. Id. He had a friend in Orlando with whom he spoke a couple times a month. Id. He stated that if he left the house, it would just be to pick up food to eat at home. Id. He had no difficulty with written or spoken instructions, and he watched TV throughout the day and had no problem watching a full movie. Id. He enjoyed going online and would browse around for 30 minutes. Id. He did not like to be around people; he was fine if there were a lot of people present when he went to buy food, but if it was overcrowded he would feel anxious that people were watching him and he would leave. Id. He did not feel paranoid at home, but he sometimes felt like someone would rob the house. Id. He had no problem getting along with authority figures. Id.

### THIRD-PARTY FUNCTION REPORT

On May 31, 2016, Claimant's mother, Maria Prieto ("Mrs. Prieto") completed a third-party function report in which she stated that Claimant lived at home with his family, and she spent approximately 6 hours per day with him and they ate all of their meals together. Id. at 374. Mrs. Prieto stated that Claimant's illness limited his ability to work because he lacked long periods of concentration and he got tired easily, and there were days when he had no motivation. Id. She stated that Claimant's daily activities included watching TV, taking a nap, getting ready to go to work, and going to bed. Id. at 375. He did not take care of anyone else or take care of any pets. Id. She stated that, before his illness, Claimant was a full-time student, could work without limitations, went out to socialize with his friends, and had his own car. Id. She stated that his illness did not affect his sleep. Id. She stated that since his illness, Claimant preferred to be in pajamas, and some days he did not want to shower, and he had to be reminded to shower and

shave.  Id. at 375-76.   She stated that he would forget to take his medication, so she prepared his medication for him daily.  Id. at 376.

Mrs. Prieto stated that Claimant did not prepare his own meals because he did not feel like preparing food and would prefer that she do it for him.  Id.  He did not do any chores, and if she told him to do chores, he still did not help because he had no interest or motivation in doing chores. Id. at 376-77.  She stated that Claimant only went outside when he was commuting to work, and he was able to go out alone, but he did not drive because he did not have a car anymore.  Id. at 377.  He did not do any shopping and he was not responsible enough to balance a checkbook or have a savings account, but he was able to pay bills and count change.  Id.  She stated that his ability to handle money had not changed since his illness began.  Id. at 378.

Mrs. Prieto stated that Claimant's hobby was watching TV, and he would watch TV every day.  Id.  He watched TV more frequently after his illness began.  Id.  She stated that Claimant did not spend time with others or go out on a regular basis.  Id.  He did not have any problems getting along with other people, but he was less social with friends and more reserved since his illness began.  Id. at 379.

Mrs. Prieto stated that Claimant's illness affected his memory, concentration, and understanding, because he would forget easily and it was hard for him to concentrate on reading or watching a long TV program or movie, and he had a hard time understanding.  Id.  She stated that Claimant was right-handed, and that he could walk less than 100 yards before needing to rest for five minutes; that he could pay attention for twenty minutes or less; that he could not finish what he started; and that he could not follow written instructions well because he found it difficult to follow steps, but he could follow spoken instructions well.  Id.  She stated that he could get along with authority figures well but he had a hard time handling stress and did not like to be put

in stressful situations; that when he felt stressed, he would walk away from the stressful situation; and that he did not like changes in routine.  Id. at 380.  She stated that he had days where he was sleepy and depressed, and some days he barely ate and on other days he ate a lot.  Id.  She stated that he has been wearing glasses since November 2015.  Id.  She stated that he took medications for his illness but did not indicate that he had any side effects from his medications.  Id. at 381.

## HEARING TESTIMONY

A hearing was held on August 3, 2018, before ALJ Hemming, at which Claimant, Ms. Prieto, and VE Jackson testified.  Id. at 46-78.

### I.     Claimant

Claimant testified that he resided at 9231 South West 148th Court, Miami, Florida, 33196. Id. at 59.  He was present at the hearing with Ms. Prieto, who is not an attorney.  Id. at 59-60.  He stated that he understood his right to representation, but he wanted to proceed with the hearing without an attorney.  Id. at 60, 69-70.  Claimant was born on October 29, 1989 and he was 28 years old.  Id. at 78.  He weighed around 220 pounds and his height was 5'6".  Id.  His highest level of education completed was an associate degree in Art from Miami Dade College.  Id. at 79.

In 2006, Claimant worked for the Ice Arena of Kendall, first as a skate guard, where he would give out skate rentals and skate around the rink to pick up people who fell; after a year, he was promoted to supervisor.  Id. at 79-80.  As a skate guard, he would have to lift approximately 50 pounds when he helped people who fell.  Id. at 81.  When he became a supervisor, he typically supervised four employees per shift.  Id. at 82.  He would also help at the snack bar by preparing snacks like popcorn, pizza, and fries, and he would supervise two employees at the snack bar.  Id. As a supervisor, the heaviest weight he had to lift was around 40-50 pounds for cartons of cola syrup for fountain drinks.  Id. at 83.  In both positions, he worked part-time, approximately 25

hours per week, because he was a high school student at the time.  Id. at 84.  He graduated from high school in 2008.  Id.  He continued to work at Ice Arena of Kendall part-time after he started attending college.  Id. at 85.  In 2010, he earned approximately $14,000 for the year working part-time.  Id. at 85.  In 2011, he earned approximately $6,000 because he started having breakdowns. Id.  He did not work in 2012.  Id.

In 2013, he started working for CarMax selling cars and helping customers who wanted to have their cars appraised.  Id. at 86.  He would take down customers' information and take them to test drive cars; he did not have to lift more than a pound at this job.  Id. at 86-88.  He earned approximately $4,000 in 2013, and approximately $2,000 in 2014.  Id. at 88.  He left because he had a breakdown.  Id.

In 2016, Claimant started working at his current job at Amazon as a fulfillment associate, sorting and scanning packages and putting them in the pallets where they belonged so they could be shipped.  Id. at 90.  He did not operate any machinery.  Id. at 93.  He lifted heavy boxes that could weigh more than 50 pounds, although it was recommended that he get help to lift boxes over 45 pounds.  Id. at 93.

Claimant stated that his illness was depression at first, then he became manic and very hyper.  Id. at 94.  He took the following medications: Abilify, which caused him to feel tired and sleep a lot during the day; metformin, which controlled his diabetes and did not cause any side effects; atorvastatin, which controlled his high cholesterol and did not cause any side effects; and meloxicam which he sometimes took when he had pain in his shoulder or back.  Id. at 98-102.  He no longer took Benztropine, which he had been taking to counter the side effects of a previous medication.  Id. at 97.  He stated that his diabetes and high cholesterol were the result of weight caused by his original medications.  Id. at 100.

Prior to 2012, Claimant used to go to the gym and work out.  Id. at 102.  He liked to run, jog, ride his bicycle, go to the park with his friends and play basketball, and go fishing at the beach. Id. at 102-03.  Because of his illness, he did not go to the gym or jog anymore.  Id. at 104.

Claimant saw his psychiatrist every three months.  Id. at 104.  He used to take Seroquel to bring him down since he was manic, but he did not like the way it made him feel.  Id. at 105.  With his current medications, he was stable and not manic.  Id. at 105-06.

Claimant stated that he has been Baker Acted since 2012; he recalled being Baker Acted two or three times in 2014.  Id. at 107.  He worked part-time at Amazon by choice because when he tried to work more hours at CarMax, he started having psychotic episodes from stress.  Id. at 107-108.

Claimant stated that when he went for his doctor's appointment, he saw Dr. Hernando if he wanted to see the doctor to ask about changing medications, but if he was feeling fine, he saw ARNP Poviones.  Id. at 108.

On a typical day, Claimant would wake up, have breakfast, and watch TV, and then fall asleep about an hour after breakfast because he would take his medication after breakfast and it would make him drowsy.  Id. at 109.  After he woke up, he would watch more TV or watch a movie on the internet.  Id. at 109-110.  He liked to watch the Discovery channel and the History channel, or sports like soccer.  Id. at 110.  Claimant prepared his own breakfast, but his mother prepared his lunch and dinner and did his cleaning and laundry.  Id. at 111.  He picked out his own clothes for work.  Id. at 112.  Claimant had a driver's license and he drove to work.  Id. at 112-13. Claimant worked at night and he and his father would go to work together because his father also worked part-time at Amazon.  Id.  He did not go out much except for work, although he went to a basketball game with his brother and found it interesting because he liked sports.  Id. at 113.

Claimant's mother and father went grocery shopping and clothes shopping for him; and other than for work, doctor's appointments, and occasional haircuts, he did not like to go out.  Id. at 114-115. He did not have friends over because he only had a few friends and they did not live locally, and he did not play video games.  Id. at 115.

## II.    Ms. Prieto

Ms. Prieto stated that she was married to Claimant's eldest brother and that she had known Claimant for 25 years, since he was two years old.  Id. at 90.  Ms. Prieto stated that Claimant has another older brother, who is incarcerated, who was diagnosed with bipolar disorder, borderline schizophrenia, and manic depression.  Id. at 71.  She stated that, in 2011, Claimant started having breakdowns; he took off to Nevada on his own and had a mental breakdown there and was kept in a facility for four months before he was released to his family.  Id. at 89.  She stated that Claimant had also been Baker Acted several times in Miami, and it was triggered by the times his brother was released from jail.  Id.  She stated that Claimant's manic episodes were extremely severe; that Claimant tried to go into places he thought were his, such as banks and a luxury car collection, thinking he owned a car there.  Id. at 94-95.   She stated that Claimant's illness was strongly based on triggers, and that his major trigger was whenever his brother was out of jail.  Id. at 96.  She stated that Claimant's job at Amazon was very good for him because it was not stressful – it was focused on doing specific tasks - and that he had a very strong work ethic and was very good at work.  Id.  She stated that Claimant used to be very outgoing and involved with her three children, his nephews and niece, and after his illness, he was still involved, but he did not have the same spirit.  Id. at 103.  He still spent time with his nephews and niece, but he was more robotic.  Id. at 104.  She stated that Claimant's medications left him stable but not in a happy state, and that Claimant did not have the zest and motivation that he used to have.  Id. at 105-106.  She stated that

Claimant used to be extremely studious.  Id. at 105.  He was on the Dean's list at Miami Dade College and he was accepted to the University of Florida ("UF"), but UF became a trigger and his brother had to go pick him up after he had an anxiety attack and would not leave the room.  Id. at 105-06.  She hoped to see him achieve more balance between less psychotic medications and more zest, but his doctor said he was not ready.  Id. at 106.  She stated that Dr. Hernando was an amazing doctor who got Claimant stabilized when others could not.  Id. at 109.

### III.    VE Jackson

VE Jackson classified Claimant's prior work as follows:

➢ Vendor, DOT #291.457-022,[8] with an exertional level of medium and a Specific Vocational Preparation (hereafter, "SVP") of 2;[9]

➢ Hospitality House Supervisor, DOT #359.137-010, with an exertional level of light and an SVP of 6.[10]

➢ Store Laborer, DOT #922.687-058, with an exertional level of medium and an SVP of 2.

---

[8] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[9] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  Id.

[10] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b).  An SVP of 6 means that preparation for the job should take "[o]ver 1 year up to and including 2 years." http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

     ➢  Automobile Salesperson, DOT #273.353-010, with an exertional level of light and an SVP of 6.

Id. at 117.

ALJ Hemming posed to VE Jackson two hypotheticals for an individual of Claimant's age, with his education and work experience who:

1) can function at the medium functional level and has no postural limitations, no manipulative limitations, and no environmental limitation except that the individual would be limited to only frequent exposure to hazards; can have unlimited interaction with supervisors, but only frequent interaction with coworkers, and only frequent interaction with the public. (Hypothetical No. 1).

2) had the same abilities as the individual in Hypothetical No. 1; except that the individual, who is right-hand dominant, can only frequently reach using his right arm and hand because of pains in his right hand and his back, but has unlimited ability to reach using his left hand; and has unlimited ability to handle objects bilaterally, unlimited ability to finger bilaterally, and unlimited ability to feel using his fingers bilaterally; and has the same environmental and mental limitations as in Hypothetical No. 1. (Hypothetical No. 2).

3) is off task more than 15% of the workday due to drowsiness caused by medications taken for illnesses; and has the same exertional limitations as in Hypothetical No. 2.

Id. at 117-18, 121-22.

VE Jackson testified that the individual in Hypothetical No. 1 and in Hypothetical No. 2 would be able to perform Claimant's past work.  Id. at 120-22.  VE Jackson testified that the

individual in Hypothetical No. 3 would not be able to perform Claimant's past work or any other jobs in the national economy.  Id. at 122.

Pursuant to Ms. Prieto's questions, ALJ Hemming then asked VE Jackson: If the individual in Hypothetical No. 1 and in Hypothetical No. 2 were limited to simple, routine tasks, could have unlimited interaction with supervisors, but only occasional interaction with coworkers, and only occasional interaction with the public, whether this individual would be able to perform Claimant's past work.  Id. at 125-26.  VE Jackson testified that if the individual in Hypothetical No. 1 and in Hypothetical No. 2 were limited to an SVP of 2, the individual would only be able to perform Claimant's past work as a store laborer.  Id. 126-27.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

## REGULATORY FRAMEWORK: THE EIGHT-STEP SEQUENTIAL PROCESS

In 20 C.F.R. §404.1594(f)(1)-(8), the Social Security Regulations outline an eight-step 'sequential' evaluation process used to determine whether a claimant continues to be disabled.

25

First, the ALJ must determine whether the claimant is engaging in SGA.  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is no longer disabled.  Nadal v. Astrue, No. 09-61366-CIV, 2010 WL 2427412, at *10 (S.D. Fla. May 27, 2010).  In the present case, the ALJ determined that Claimant had not engaged in SGA, and proceeded to step two.  TR. 35.

At the second step, the ALJ must determine if the claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Nadal, 2010 WL 2427412, at *10.  If so, the ALJ must find the claimant's disability to continue; if not, then the ALJ should proceed to step three. Id.  Here, the ALJ determined that Claimant "did not have an impairment or combination of impairments which met or equaled the severity" of a listed impairment.  TR. 35.  Therefore, the ALJ proceeded to step three.

At step three, the ALJ must determine if the claimant has experienced any medical improvements.  Nadal, 2010 WL 2427412, at *10.  Medical improvement includes "any decrease in medical severity of the impairment which was present at the time of the most recent favorable decision finding the claimant disabled."  Id.  If medical improvement has occurred, then the ALJ should proceed to the fourth step; if not, then the ALJ should proceed to the fifth step.  Id.  In the present case, the ALJ found that "[t]he medical evidence supports a finding that, by January 1, 2016, there had been a decrease in medical severity present at the time of the CPD."  TR. 36.  The ALJ concluded at this step that Claimant did experience medical improvement, and proceeded to step four.  Id.

Step four requires the ALJ to determine whether the medical improvement is related to the claimant's ability to work.  Nadal, 2010 WL 2427412, at *10.  Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work

activities.  20 C.F.R. §404.1594(b)(3).  If there is a relationship to the claimant's ability to do work, the ALJ must proceed to the sixth step; however, if there is no relationship, the ALJ must then proceed to the fifth step.  Nadal, 2010 WL 2427412, at *10.  Here, the ALJ determined that Claimant's medical improvement was related to his ability to work because, by January 1, 2016, Claimant's CPD impairments no longer met or medically equaled the same listing that was met at the time of the CPD.  TR. 36.  Therefore, the ALJ proceeded to the sixth step.[11]

At step six, the ALJ must determine if the claimant's impairments are "medically severe." If the ALJ determines that the claimant's impairments are medically severe then he or she must proceed to the next step.  Nadal, 2010 WL 2427412, at *10.  Here, the ALJ found that Claimant's impairments were severe because they "cause more than minimal limitation in [his] ability to perform basic work activities," and thus, proceeded to the seventh step.  TR. 36.

Step seven is a two-pronged process, which first requires the determination of the claimant's RFC, and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  Nadal, 2010 WL 2427412, at *10.  If the claimant has the capacity to perform past relevant work, then his disability has ended; if not, the ALJ must proceed to the last step.  Id.  As to the first prong, ALJ Hemming determined that Claimant had the RFC to:

> perform medium work.  See 20 CFR 404.1567(c).  Specifically, the claimant can lift no more than 50 pounds occasionally. He can lift and/or carry up to 25 pounds frequently.  He can stand and/or walk for about 6 hours and sit for up to 6 hours in an 8-hour workday with normal breaks.  He has no postural limitations.  He is limited to frequent reaching, including overhead reaching, using the right arm.  He can have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and environmental irritants such as dusts, odors, fumes, and pulmonary irritants, but only frequent exposure to hazards.  Mentally, the claimant can have unlimited interaction with supervisors, but only frequent interaction with co-workers, and the public.

---

[11] At the fifth step, the ALJ must determine whether any exceptions to the medical improvement standard exist.  Nadal, 2010 WL 2427412, at *10.  In the present case, the ALJ did not have to make this determination because the ALJ found that a medical improvement did occur and that it was related to Claimant's ability to work.  TR. 36.

TR. 37.  Based on Claimant's RFC, ALJ Hemming concluded that Claimant was capable of performing past relevant work as a vendor, hospitality house supervisor, store laborer, and automobile salesperson because this work did not require the performance of work-related activities precluded by Claimant's RFC based on the impairments present since January 1, 2106. Id. at 39-40.  Therefore, the ALJ concluded that Claimants disability ended on January 1, 2016. Id.

**EVIDENCE SUBMITTED POST-DECISION
TO THE APPEALS COUNCIL**

**1)  Jackson South Behavioral Health ("Jackson")**

On November 12, 2018, Claimant was referred to Jackson by Dr. Hernando, and was admitted for delusional ideas and atypical psychosis, and diagnosed with chronic bipolar disorder. TR. 23.  Plaintiff was discharged on November 21, 2018 with instructions to adhere to his medication and follow up with a psychiatrist and community mental health resources.  Id. at 23-24.  Claimant denied suicidal or homicidal ideations.  Id. at 24.  He was prescribed new medications for anxiety, delusions, and insomnia.  Id. at 24-25.  His lab results were unremarkable. Id. at 26-27.

**2)  Dr. Hernando**

On December 17, 2018, Dr. Hernando completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("Medical Source Statement").  Id. at 11-13.  Dr. Hernando opined that Claimant had moderate limitations in his ability to understand and remember short, simple instructions, and to carry out short and simple instructions.  Id. at 11.  He further opined that Claimant had marked limitations in his ability to understand and remember detailed instruction, to carry out detailed instructions, and to make judgments on simple work-related

decisions.  Id.  Dr. Hernando opined that Claimant presented with prominent symptoms of mania and psychosis which clearly interfered with his capacity to perform activities of daily living.  Id.

Dr. Hernando further opined that Claimant had market limitations in his ability to interact appropriately with the public, supervisors, co-workers, to respond appropriately to work pressures in a usual work setting, and to respond appropriately to changes in a routine work setting.  Id. at 12.  Dr. Hernando opined that Claimant had low attention and low concentration, and was easily distracted and not able to handle stress.  Id.  Dr. Hernando indicated that Claimant could not manage benefits in his own best interest.  Id. at 13.

On December 17, 2018, Dr. Hernando also completed a Mental RFC Assessment.  Id. at 14-16.  Dr. Hernando opined that Claimant had moderate limitations in his ability to remember locations, work-like procedures, and very short instructions, and had marked limitations in his ability to understand and remember detailed instructions.  Id. at 14.  Dr. Hernando further opined that Claimant had moderate limitations in his ability to carry out very short and simple instructions, and had marked limitations in all other areas of sustained concentration and persistence.  Id. at 14-15.  Dr. Hernando further opined that Claimant had marked limitations in all areas of social interaction and adaptation.  Id. at 15.  Dr. Hernando opined that Claimant presented "a long standing history of bipolar disorder with multiple episodes of mood and psychotic symptoms and behavior which has been present despite adequate treatment and that clearly interact[ed] with his capacity to perform any work, social or personal activity on daily basis."  Id. at 16.

On December 21, 2018, Dr. Hernando stated in a letter that Claimant's psychiatric history showed a persistent pattern of permanent mood and manic symptoms and behaviors, which required him to be admitted to multiple psychiatric facilities since 2011, and some of which required several weeks of inpatient treatment prior to discharge and continued outpatient follow-

up.  Id. at 3.  Dr. Hernando opined that Claimant's medical history demonstrated very prominent, persistent and pervasive history of psychiatric treatment and behavior with periods of stabilization followed by acute exacerbation of symptoms and subsequent psychiatric hospitalization; and that Claimant's condition throughout the years did not allow him to perform activities of daily living or any work, social or recreational activity at an adequate pace in order to be able to function appropriately in society.  Id.  Dr. Hernando opined that Claimant's condition made him a good candidate to be declared disabled and therefore unable to work.  Id.

On October 4, 2019, the Appeals Council concluded that this additional evidence "d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision" and denied Claimant's request for review of ALJ Hemming's decision.  Id. at 48-49.

## DISCUSSION

As noted above, Claimant argues that:

I.      The ALJ's RFC assessment was incomplete because it:

    a.  Failed to account for Claimant's mental impairments; and

    b.  Failed to account for Claimant's medication side effects.

II.     The Appeals Council erroneously found that new evidence submitted to it was not likely to change the ALJ's decision.

See Claimant's Motion for Summary Judgment [D.E. 27 at 4-13].  The undersigned finds no merit in any of these contentions.

**I.      Whether the ALJ's RFC assessment was incomplete.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-

8p.[12]   Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id.  "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer, 395 F.3d at 1210).

Claimant argues that the ALJ's RFC assessment was incomplete because the ALJ failed to account for his mental impairments and medication side effects.

**a.  Whether the ALJ failed to properly evaluate Claimant's mental impairments.**

"The ALJ must consider medical opinions together with relevant evidence in the record." Hand v. Soc. Sec. Admin., Comm'r, No. 18-14147, 2019 WL 4447206, at *3 (11th Cir. 2019)

---

[12] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.  SSR 96–8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination.  Id.; see also Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

(citing 20 C.F.R. § 404.1527(b)).  When weighing medical opinions, "the ALJ should consider the following factors: the examining and treatment relationship between the claimant and doctor; the supportability and consistency of the opinion with the record as a whole; the specialization of the doctor; and other factors that tend to support or contradict the opinion." Hand, 2019 WL 4447206, at *3 (citing 20 C.F.R. § 404.1527(c)).  The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." Milner v. Barnhart, 275 F. App'x 947, 948 (11th Cir. 2008) (citing 20 C.F.R. § 404.1527(f)(2)(i)).

Claimant argues that the ALJ failed to properly evaluate Claimant's mental impairments by rejecting portions of the State agency consultants' opinions that Claimant had moderate limitations in maintaining concentration, persistence, or pace, and was limited to simple, repetitive tasks.  See Claimant's Motion for Summary Judgment [D.E. 27 at 6].

ALJ Hemming assigned "great weight" to the State agency consultants' opinions, which he found to be consistent with Claimant's medical evidence of record, and only discounted the portion of the State agency consultants' opinion which he found to be inconsistent.  TR. 39.  ALJ Hemming explained:

> The only portion of the opinion I dispute is that their finding for moderate limitation in concentration and limitation to unskilled work is too restrictive and likely represents their estimation of the claimant's functioning at the time rather than over the entire period at issue.  Otherwise, the opinion is adopted in full.  The claimant is currently working at Amazon as a fulfillment associate.  He has maintained good relationships at least with his sister-in-law, nieces, and nephews.  He has had earnings at, or near, substantial gainful activity since the 2nd quarter of 2016.

Id. at 39.

Claimant argues that the ALJ's explanation that the State agency consultants' limitations "likely represents their estimation of the claimant's functioning at the time rather than over the

entire period at issue" shows baseless speculation of what the consultants were thinking, and that he improperly substituted his own opinion for those of medical professionals.  See Claimant's Motion for Summary Judgment [D.E. 27 at 6].   However, Dr. Bruno's opinion was issued on January 15, 2016 and Dr. Eeltink's opinion was issued on June 8, 2016; therefore, there was no speculation when the ALJ noted that their opinions were based on their estimation of Claimant's functioning in 2016, as opposed to considering the evidence of record up to 2018.   ALJ Hemming cited to Claimant's mental health treatment records from Dr. Hernando from March 2014 through July 2018, and noted that "[w]ith the exception of one occasion, the claimant's concentration has been intact on mental status examinations."  TR. at 35.  Thus, ALJ Hemming's determination that Claimant had only mild limitations with regard to concentrating, persisting, or maintaining pace was not based on speculation, but relied on Claimant's medical records from his treating psychiatrist through 2018.  Id.  Furthermore, ALJ Hemming explained that he found the State agency consultants' opinion restricting Claimant to unskilled work too limiting, noting that Claimant had not had any recent Baker Act admissions, that his hearing testimony and his treatment records indicated that he was stable on medication, and that he had been doing well working at Amazon since 2016.  Id. at 35, 38.

Because ALJ Hemming showed good cause for discounting a portion of the State agency consultants' opinions, and the ALJ's determinations were sufficiently supported by substantial evidence, there is no error in ALJ Hemming's weighing of the State agency consultants' medical opinions.  Strickland, 516 F. App'x at 831.[13]

---

[13] The Commissioner argues that even if the Court disagrees, any error is harmless because in Valdez v. Comm'r of Soc. Sec., 808 F. App'x 1005 (11th Cir. 2020), the Eleventh Circuit held that a limitation to simple, routine, and repetitive work is not inconsistent with DOT Reasoning level 2 work.   See Commissioner's Motion for Summary Judgment [D.E. at 9-10 n.3] (citing Valdez, 808 F. App'x at 1009). Claimant disputes that the error was harmless.  See Claimant's Reply Brief in Support of His Motion for Summary Judgment ("Reply") [D.E. 30 at 2-5].  Since the undersigned finds that the ALJ's rejection of the

**b. Whether the ALJ failed to properly evaluate Claimant's medication side effects.**

The evaluation of any medication side effects is one of several factors the ALJ must consider when evaluating the intensity and persistence of symptoms.  See 20 C.F.R. § 404.1529 (c).  However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the court] to conclude that the ALJ considered [Claimant's] medical condition as a whole."  Dyer, 395 F.3d at 1211.  When substantial evidence supports the ALJ's decision, it must be affirmed.  See Crawford, 363 F.3d at 1158-59.

Claimant argues that ALJ Hemming's RFC assessment is incomplete because he failed to account for Claimant's alleged medication side effects.  See Claimant's Motion for Summary Judgment [D.E. 27 at 7].  However, Claimant has not identified any evidence showing that he suffered medication side effects.  Claimant admits that he has on occasion denied having any side effects, but he argues that he has also on occasion complained of sleepiness and fatigue from taking Abilify, and that the ALJ erred by not addressing this.  Id.

In his summary of the Claimant's testimony, ALJ Hemming specifically recounted Claimant's subjective complaints of tiredness and sleepiness from his psychiatric mediations, and his testimony that he went to sleep after eating breakfast.  TR. at 37.  In evaluating the intensity and persistence of Claimant's symptoms, ALJ Hemming explained that Dr. Hernando's treatment records noted that Claimant was "stable and responding well to treatment with no side effects reported."  Id. at 39.  ALJ Hemming concluded:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not entirely consistent with

State agency consultants' opinion limiting Claimant to unskilled work was based on good cause, there is no error, harmless or otherwise.

the medical evidence and other evidence in the record for the reasons explained in this decision.

Id.

Given that ALJ Hemming's RFC determination was supported by evidence from Dr. Hernando's treatment notes consistently showing that no medication side effects were reported, the RFC assessment was supported by "such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Kieser, 222 F. Supp. 2d at 1305.  Accordingly, there is no error arising from ALJ Hemming's consideration of the alleged side effects of Claimant's medications.

**II.     Whether the Appeals Council erred in denying review of the ALJ's decision.**

As noted above, on October 4, 2019, the Appeals Council concluded that the additional evidence submitted by Claimant "d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision" and denied Claimant's request for review of ALJ Hemming's decision.  Id. at 48-49.  The additional evidence consisted of: (1) a discharge summary from Jackson for a psychiatric admission from November 12, 2018 to November 21, 2018; (2) a Medical Source Statement and a Mental RFC Assessment from Dr. Hernando, dated December 17, 2018; and (3) a letter from Dr. Hernando, dated December 21, 2018.  TR. 3, 11-16, 22-29.  Claimant challenges the Appeals Council's decision.  See Claimant's Motion for Summary Judgment [D.E. 27 at 9-13].

Generally, a claimant may present additional evidence at each stage of the administrative review process.  See 20 C.F.R. § 404.900(b).  Pursuant to regulations that took effect on January 17, 2017, the Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20

C.F.R. § 404.970(a)(5).  See also McIntyre v. Berryhill, No. 17-14347-CIV, 2018 WL 5621483, at *6 (S.D. Fla. Oct. 30, 2018) (The new regulation raised the bar for obtaining Appeals Council review of an ALJ's unfavorable decision by adding additional requirements.).

As an initial matter, the discharge summary from Jackson, Dr. Hernando's Medical Source Statement and a Mental RFC Assessment, and Dr. Hernando's letter were new because they included evidence that was not submitted to ALJ Hemming.

Regarding whether Claimant's additional evidence "relates to the period on or before the date of the hearing decision", the discharge summary from Jackson indicated that Claimant was admitted on November 12, 2018, which is after the ALJ issued his hearing decision on October 31, 2018.  Therefore, this evidence does not relate to the period on or before the date of the hearing decision.  See McGriff v. Comm'r, Soc. Sec. Admin., 654 F. App'x 469, 472 (11th Cir. 2016) (The Appeals Council did not err in refusing to consider records that related to a time period after the date of the ALJ hearing decision.).

Claimant argues that Dr. Hernando's December 17, 2018 Medical Source Statement and Mental RFC Assessment and his December 21, 2018 letter are related to the period on or before the date of the hearing decision because Dr. Hernando's opinions are based on Claimant's entire psychiatric record through the years.  See Claimant's Motion for Summary Judgment [D.E. 27 at 11-12].[14]  In his Medical Source Statement and Mental RFC Assessment, Dr. Hernando opined that Claimant had marked limitations in nearly all levels of functioning and that his illness interfered "with his capacity to perform any work, social or personal activity"; and in his letter, dated December 21, 2018, Dr. Hernando opined that Claimant's "history demonstrates a very

---

[14] Claimant also argues that Dr. Hernando's opinions are consistent with the new evidence of his November 12, 2018 psychiatric admission.  However, as noted above, this new evidence does not relate to the period on or before the date of the hearing decision; rather, it relates to Claimant's status in the period following the ALJ's decision.

prominent, persistent, and pervasive history of psychiatric treatment and behavior with periods o[f] stabilization follow[ed] by acute exacerbation of symptoms and subsequent psychiatric hospitalization"; therefore, Claimant was unable "to perform activities of daily living as well as any work, social or recreation activity at an adequate pace in order to be able to function appropriately in society." TR. 3, 11-16.

These opinions are not consistent with the evidence of record before the ALJ, which was largely derived from Dr. Hernando's own treatment records. Those records, which repeatedly noted generally unremarkable mental status exam findings aside from anxious mood and fair eye contact, insight, and judgment, as well as records evidencing Claimant's lack of recent psychiatric hospitalizations, Claimant's employment history, Claimant's testimony, and the State agency consultants' opinions, all indicated that Claimant was stable on medication. Id. at 39. Moreover, as ALJ Hemming noted, Claimant had earnings at, or near, SGA since the second quarter of 2016. Id. Therefore, contrary to Claimant's contention, Dr. Hernando's December 2018 opinions do not relate to the time period on or before the date of the ALJ's hearing decision as required by 20 C.F.R. § 404.970(a)(5). See also Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) ("We review the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision.").

Because Claimant's additional evidence does not relate to the period on or before the date of the hearing decision, there is no error in the Appeals Council's denial of Claimant's request for review of the ALJ's decision.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 25] be DENIED, the

Commissioner's Motion for Summary Judgment [D.E. 28] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

DONE AND ORDERED in Chambers at Miami, Florida, this 19th day of August, 2021.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Judge Jose E. Martinez
        Counsel of Record

38